IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ADRIENNE LOMBARDO, | : | Civil No.  4:24-CV-56 |
| | : | |
| Plaintiff | : | |
| | : | |
| v. | : | (Magistrate Judge Carlson) |
| | : | |
| FRANK BISIGNANO,[1] | : | |
| Commissioner of Social Security, | : | |
| | : | |
| Defendant. | : | |

## MEMORANDUM OPINION

### I.   Introduction

This case involves a recurring issue in Social Security litigation: The alleged unexplained failure of the Administrative Law Judge (ALJ) to incorporate a one-to-two-step task limitation made by a medical source the ALJ deems persuasive into a claimant's residual functional capacity assessment.

This can be an outcome determinative error since a claimant's ability to perform the mental demands of the workplace are often essential to the disability

---

[1] Frank Bisignano became the Commissioner of Social Security on May 6, 2025. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Frank Bisignano should be substituted as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

determination. Therefore, when an individual's ability to perform one-to-two-step tasks is at issue in a Social Security appeal, it is incumbent upon the ALJ hearing this disability claim to provide a logical bridge between the evidence and the ALJ's legal conclusions and factual findings, a logical nexus which addresses the claimant's mental limitations in these areas and explains how they do not preclude employment.

Although it is ultimately the ALJ who makes the RFC determination, and determines which medical opinions and evidence deserve greater weight, it is also well-settled that, when evaluating medical opinions, an ALJ should refrain from substituting his own lay opinion in place of a medical opinion. See Morales v. Apfel, 225 F.3d 310, 319 (3d Cir. 2000). Moreover, while the ALJ may choose which medical opinions are persuasive, "[f]or each limitation opined necessary by a persuasive medical source, the ALJ is obligated to either: (1) incorporate that limitation in the claimant's RFC, or (2) explain the basis for discounting that limitation. Such an obligation ensures that any omission was intentional and supported by substantial evidence in the record." Cruz v. Bisignano, No. 1:24-CV-1966, 2025 WL 2813882, at *7 (M.D. Pa. Sept. 30, 2025) (citing Steinmetz v. Colvin, Civ. No. 23-CV-2066, 2025 WL 36159, *7 (M.D. Pa. Jan. 6, 2025); Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir. 1979)). Applying these legal

benchmarks, a rising tide of caselaw has held that the unexplained failure of an ALJ to incorporate a one-to-two-step task limitation set forth in a medical opinion deemed persuasive constitutes error which may compel remand.

We are reminded of these familiar principles in the instant case. In this case, the ALJ found that the plaintiff, Adrienne Lombardo, was not disabled and was capable of performing simple tasks. The ALJ reached this conclusion even though Lombardo's treating source found that her mental impairments were totally disabling. Instead, the ALJ claimed to be persuaded by the opinions of two non-treating, non-examining state agency experts. However, the ALJ's evaluation of these two medical opinions was flawed in at least two ways. First, the ALJ dealt with these two opinions collectively, finding both opinions persuasive without apparently recognizing that there were significant differences between these two opinions.

Second, without explanation the ALJ failed to incorporate or acknowledge a critical aspect of one of these state agency expert medical opinions which the ALJ found persuasive; namely, the expert's conclusion that Lombardo could perform one- and two-step tasks. The ALJ then identified occupations the plaintiff could perform based on this RFC, which required reasoning levels of two or three, reasoning levels which exceeded the one-to-two-step task limitation prescribed by the state agency expert. The failure of the ALJ to acknowledge or account for this

limitation is notable because: (1) a limitation to simple tasks is not equivalent to a one-to-two-step limitation; and (2) numerous courts have concluded that occupations requiring a reasoning level of 2 are not compatible with one-to-two-step task limitations. Here, despite a treating source opinion that Lombardo was totally disabled, the ALJ instead credited non-treating, non-examining sources. Yet, while the ALJ found the opinion of the state agency mental consultants persuasive, he failed to reconcile the material differences in these opinions. Nor did the ALJ address or acknowledge the limitation to one- and two-step tasks opined by one of these experts that were deemed persuasive when crafting a mental residual functional capacity for Lombardo. Thus, in our view, the ALJ's analysis does not provide a complete logical bridge for the decision denying benefits to the plaintiff.

This was error. Therefore, we will remand this case for further consideration by the Commissioner.

## II.    <u>Statement of Facts and of the Case</u>

On September 30, 2019, the plaintiff, Adrienne Lombardo, filed applications for  disability and disability insurance benefits and supplemental security income pursuant to Titles II and XVI of the Social Security Act. (Tr. 22). In both applications, Lombardo alleged disability beginning April 17, 2019. (<u>Id.</u>) Lombardo alleged that she was disabled due to an array of impairments, including major

depressive disorder and generalized anxiety disorder. (Tr. 25). Lombardo was born on November 6, 1985, and was 33 years old on the alleged disability onset date, making her a younger worker under the Commissioner's regulations. (Tr. 34). She had at least a high school education, and prior employment as a teaching assistant. (Id.)

On appeal, Lombardo has focused upon her emotional impairments, and the ALJ's alleged failure to adequately consider the degree to which those impairments limited her to one-to-two-step tasks. With respect to these issues, the clinical record—while equivocal—contained evidence that Lombardo's mental health fluctuated dramatically over time. Moreover, these treatment notes documented significant, recurring cyclical mental health crises. At its worst, Lombardo's mental health led her to consider suicide on several occasions; in other instances, caregivers reported that her symptoms were relatively unremarkable.

As the ALJ observed:

The record establishes the claimant has a history of major depressive disorder and generalized anxiety disorder. In May 2019, the claimant reported stress associated with work that was causing her to experience suicidal ideations (Exhibit 2F at 16). At the time, she entered into a contract for safety and was provided a list of therapy providers (Exhibit 2F at 17). Additional records from the same month note the claimant started medications to treat her conditions (Exhibit 4F at 8). In July 2019, the claimant reported periodic panic attacks that were impacting her ability to sleep (Exhibit 11F at 28). In August 2019, the claimant

5

also reported difficulty with crowds, which is impacting her ability to go places with family (Exhibit 9F). However, in December 2019, the claimant was able to attend a family get-together (Exhibit 9F). At the time, she also reported an intention to visit with family for Christmas (Exhibit 9F at 13). In December 2019, the claimant underwent a consultative examination with John Kajic, Psy.D. At the time of the evaluation, the claimant reported difficulty falling asleep and symptoms of crying spells, irritability, excessive apprehension and worry, fear of being judged or negatively evaluated social settings, restlessness, difficulty concentrating, panic attacks, self-isolation, short term memory deficits, organizational deficits, word finding deficits, planning deficits, and sequencing deficits (Exhibit 6F). On examination, the claimant was alert and oriented to person, place, and time, with a coherent and goal directed thought process and good insight and judgment (Exhibit 6F at 6-7). In addition, her attention and concentration skills remained intact (Exhibit 6F at 6). However, the testing revealed mildly impaired memory and, while the examiner noted average intellectual functioning, testing revealed low average IQ (Exhibit 6F at 7).

The claimant continued to treat her conditions in 2020. In April 2020, the claimant reported anxiety that presented with panic attacks (Exhibit 11F at 23). In July 2020, she presented to the emergency department with anxiety and stress that was causing suicidal ideations (Exhibit 12F at 15). During the visit, the claimant had an anxious mood, but normal attention, speech, behavior, and cognition (Exhibit 12F at 12). Before discharge, she spent time with crisis and was again given resources for therapeutic treatment (Exhibit 12F). Thereafter, treatment records from July 2020 note the claimant reported decreased concentration associated with her condition (Exhibit 11F at 5). However, her examination revealed that she was alert and oriented with intact memory, attention, and concentration (Exhibit 11F at 6). At the time, she also maintained intact comprehension and fluent speech (Exhibit 11F at 6). In September 2020, the claimant reported her mood as fine, but noted ongoing panic attacks (Exhibit 16F at 3). On examination, the claimant was oriented with a linear and goal directed thought process (Exhibit 16F at 3). She also maintained normal intellectual functioning

6

and fair judgment and insight (Exhibit 16F at 3). However, she had fluctuating attention (Exhibit 16F at 3). The claimant continued to report doing well overall through December 2020 (Exhibit 25F). At the time, she specifically noted that her anxiety was manageable on medication and that her depression was getting better (Exhibit 25F at 25).

Thereafter, treatment records from January 2021 continued to note the claimant reported doing well overall (Exhibit 25F at 22). At the time, she continued to have normal findings related to her speech, thought process, orientation, memory, judgment, insight, attention, concentration, and fund of knowledge (Exhibit 25F at 23). She continued to report doing okay in April 2021 reported doing okay (Exhibit 25F at 4). Her examination noted she was oriented with an appropriate thought process, nonremarkable speech and intact memory, attention, and concentration and maintained an appropriate fund of knowledge and fair judgment and insight (Exhibit 25F at 6). The claimant continued to treat with therapeutic management and had ongoing normal mental status findings through August 2021, despite some mood fluctuations (Exhibit 38F). The claimant continued to report doing well during individual therapy sessions in 2021 (Exhibit 38F at 27). In fact, in December 2021, the claimant reported being able to attend a craft show in Myrtle Beach (Exhibit 38F at 27).

The claimant was able to continue with craft shows in February 2022 (Exhibit 28F at 25). However in March 2022, the claimant reported difficulty communicating with family, which led to crying spells (Exhibit 38F at 23). As a result of the claimant's symptoms, her medication regimen was changed (Exhibit 38F at 21). In April 2022, the claimant reported doing better with the medication adjustment (Exhibit 38F at 21). During the visit, the claimant had a normal mood, normal speech, and fair judgment and insight (Exhibit 38F at 20). n June 2022, she continued to report doing well and noted success at her craft shows (Exhibit 38F at 17). Additional records from August and November 2022 note that the claimant reported her depression, anxiety, and moods are well controlled (Exhibit 35F; 38F at 3). Notably, she continued to be active with her craft shows (Exhibit 35F; 38F at 3).

> Additional records from November 2022 continued to note that she was alert and oriented to all spheres and maintained an appropriate thought process (Exhibit 38F at 4). At the time, she also maintained intact memory, normal judgment and insight, normal attention and concentration, and an appropriate fund of knowledge (Exhibit 38F at 4)

(Tr. 31-32).  Thus, the clinical record revealed periods of relative emotional stability punctuated by recurring episodic instances of debilitating anxiety and depression.

Given this clinical record, on August 8, 2021, Lombardo's treating psychiatrist, Dr. Elizabeth Revell, submitted a medical questionnaire which described from her perspective the severity of Lombardo's emotional impairments. (Tr. 900-908). Dr. Revell reported that Lombardo suffered from a major depressive disorder, agoraphobia with panic disorder and a generalized anxiety disorder. (Tr. 901). According to the doctor, her prognosis was poor. (Tr. 902). The doctor also noted that Lombardo's symptoms were exacerbated when demands were placed upon her and had resulted in hospitalization as well as absenteeism. (Tr. 903). Dr. Revell opined that these impairments would result in multiple marked impairments in Lombardo's workplace functioning. (Tr. 906-07). The doctor also concluded that Lombardo would be off-task more than 20% of the workday and would miss more than four days each month due to her impairments. (Tr. 907). As the doctor explained, Lombardo "has multiple conditions that interfere with her functioning and that exacerbate her anxiety and depression." (Tr. 908).

Two non-treating, non-examining state agency experts reached different conclusions regarding the severity of Lombardo's emotional impairments, although their findings differed somewhat from one another. On December 31, 2019, Dr. Francis Murphy conducted an initial disability determination in Lombardo's case. (Tr. 62-85). In this initial review, the doctor found that Lombardo was moderately impaired in terms of concentration, persistence and pace but otherwise suffered only a mild degree of emotional impairment. (Tr. 68). Dr. Murphy concluded that Lombardo was capable of engaging in simple repetitive tasks on a sustained basis. (Tr. 71).[2]

On reconsideration in February of 2021 a second non-examining state agency source, Dr. John Gavazzi, opined that Lombardo was moderately impaired in terms of her concentration, persistence and pace, but was otherwise unimpaired. (Tr. 102). Dr. Gavazzi then concluded that:

> The claimant can make simple decisions. The claimant would be able to maintain regular attendance and be punctual. The claimant is able to carry out very short and simple instructions. *The claimant can perform one- and two-step tasks*.

(Tr. 106) (emphasis added).

---

[2] Dr. Murphy also concluded that Lombardo's mental state was "unremarkable" in December 2019, (Tr. 82), a conclusion which is difficult to reconcile with her reported suicidal ideation in May of 2019.

Dr. Gavazzi's opinion that Lombardo could perform one-and two-steps tasks differed materially from Dr. Murphy's opinion and was significant, although its significance may have escaped the doctor. The reference to one-to-two-step tasks is a term of art in Social Security practice which connotes jobs limited to reasoning level 1, the lowest reasoning level identified in the Dictionary of Occupational Titles, since the definition of this reasoning level is confined to jobs which entail: "Apply[ing] commonsense understanding to carry out simple one- or two-step instructions." Dictionary of Occupational Titles, Appendix C - Components of the Definition Trailer, 1991 WL 688702. Thus, the state agency expert's opinion that Lombardo could perform one-and-two step tasks was tantamount to a finding that she was limited to reasoning level 1 jobs.

It was against this medical backdrop that Lombardo's disability claim came to be heard by the ALJ on October 24, 2022. Both Lombardo and a Vocational Expert (VE) testified at this hearing. (Tr. 44-61). Notably, the ALJ's hypothetical questions posed to the VE by the ALJ did not include limitations to one- and two-step tasks. (Tr. 57-59). The VE then identified several jobs which she opined Lombardo could perform. These jobs included routing clerk, postal machine operator and mail sorter. (Id.) All of these tasks entailed reasoning level two or three, reasoning levels which exceeded the one-to-two-step task limitations recommended

10

by Dr. Gavazzi.  See Routing clerk (DOT # 222.687-022), reasoning level 2, 1991 WL 672133; Postage machine operator (DOT # 208.685-026), reasoning level 2, 1991 WL 671757; Mail sorter (DOT # 209.687-026), reasoning level 3, 1991 WL 671813.

Following this hearing, on December 27, 2022, the ALJ issued a decision denying Lombardo's application for benefits. (Tr.19-43). In that decision, the ALJ first concluded that the plaintiff met status requirements of the Social Security Act through December 31, 2024, and had not engaged in substantial gainful activity since April 17, 2019, the alleged onset date. (Tr. 24). At Step 2 of the sequential analysis that governs Social Security cases, the ALJ found that Lombardo had the following severe impairments: major depressive disorder and generalized anxiety disorder. (Tr. 25). At Step 3, the ALJ determined that these impairments did not meet or medically equal the severity of any listed impairments. (Tr. 27-29).

Between Steps 3 and 4, the ALJ fashioned a residual functional capacity ("RFC"), considering the plaintiff's limitations from her impairments, stating that:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels. The claimant retains the mental capacity to perform simple and routine tasks, involving only simple work-related decisions with few, if any, workplace changes.

(Tr. 29).

11

Notably, this RFC did not include any limitation to one-to-two step tasks. In formulating the RFC, the ALJ stated that he considered the medical opinions of those experts who opined on Lombardo's mental RFC. On this score, the ALJ found the treating source opinion of Dr. Revell that these impairments were disabling unpersuasive. (Tr. 34). Instead, the ALJ embraced the opinion of the non-treating, non-examining state agency experts, although the ALJ's decision conflated and combined these two opinions without acknowledging the differences in the opinions. The ALJ's brief assessment of these opinions which formed the lynchpin of this decision simply stated:

> The undersigned considered the opinion of Francis Murphy, Ph.D., a state agency consultant. On December 31, 2019, Dr. Murphy determined the claimant had a moderate limitation in her ability to concentrate, persist, or maintain pace and mild limitations in her ability to understand, remember, or apply information, but no limitations in her ability to adapt or manage herself (Exhibit 1A). She further determined the claimant remained capable of engaging in simple repetitive activities on a sustained basis (Exhibit 1A; 2A). The undersigned considered the opinion of John Gavazzi, Psy.D., a state agency consultant. On February 2, 2021, Dr. Gavazzi determined the claimant had a moderate limitation in her ability to concentrate, persist, or maintain pace but no limitations in her ability to understand, remember, or apply information, interact with others, and adapt or manage herself (Exhibit 5A; 6A). *He further determined the claimant is able to perform one and two-step tasks and carry out very short and simple instructions* (Exhibit 5A; 6A). To the extent that the opinions find that the claimant has severe mental health impairments, they are supported by and consistent with the claimant's reports of fluctuating

12

symptoms during the relevant period. They are also supported by and consistent with the length and extent of the claimant's treatment and the findings during the relevant period, which note the claimant had frequent anxiety and panic attacks. In addition, they are supported by and consistent with the overall evidence of record, which notes some limitations in the claimant's memory, concentration, and interactions but overall records that note generally normal findings related to her orientation, thought processing, memory, judgment and insight, attention, concentration, and fund of knowledge. The opinions are also consistent with the claimant's improvement during the relevant period and ability to perform her activities of daily living. *Therefore, the opinions are persuasive.*

(Tr. 31) (emphasis added).

This cursory analysis found both opinions persuasive, even though they seemingly reached different conclusions concerning whether Lombardo was limited to one-to-two-step tasks. Moreover, the ALJ 's decision does not identify or acknowledge the differences in these opinions. Further, despite finding the state agency mental consultant opinion of Dr. Gavazzi persuasive—which the ALJ conceded included a restriction to one- and two-step tasks—the ALJ did not incorporate this limitation in the RFC or explain why it was not necessary. In fact, the ALJ did not further analyze, address, or acknowledge this limitation.

Having made these findings, the ALJ concluded that Lombardo could perform work in the national economy, including the occupations of routing clerk (DOT# 222.687-022), postage machine operator (DOT# 208.685-026) and mail sorter

13

(DOT# 209.687-026), all of which were SVP-2 occupations that exceeded the one-to-two step task mental limitations found by Dr. Gavazzi. (Tr. 35). The ALJ then determined that the plaintiff did not meet the stringent standard for disability set by the Act and denied this claim. (Id.)

With the ALJ's decision cast in this fashion, this appeal followed. (Doc. 1). On appeal, Lombardo contends, *inter alia*, that the ALJ erred in failing to address the opinion of the state agency psychologist, which the ALJ found persuasive, that limited her to one- and two-step tasks and then relying upon jobs which exceeded these mental limitations in finding that the plaintiff was not disabled. After a review of the evidence, we agree that the ALJ's omission of this limitation was divorced from any medical opinion and unexplained in the ALJ's analysis, leaving the factual, legal and logical bridge between the evidence and the ALJ's findings lacking. Therefore, we will remand this case for further consideration by the Commissioner.

## III.    Discussion

### A. Substantial Evidence Review – the Role of this Court

When reviewing the Commissioner's final decision denying a claimant's application for benefits, this Court's review is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record.  See 42 U.S.C. §405(g); Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 200

14

(3d Cir. 2008); <u>Ficca v. Astrue</u>, 901 F. Supp.2d 533, 536 (M.D. Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Pierce v. Underwood</u>, 487 U.S. 552, 565 (1988). Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla. <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971). A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence. <u>Mason v. Shalala</u>, 994 F.2d 1058, 1064 (3d Cir. 1993). But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." <u>Consolo v. Fed. Maritime Comm'n</u>, 383 U.S. 607, 620 (1966). "In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole." <u>Leslie v. Barnhart</u>, 304 F. Supp.2d 623, 627 (M.D. Pa. 2003).

The Supreme Court has underscored for us the limited scope of our review in this field, noting that:

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. <u>T-Mobile South, LLC v. Roswell</u>, 574 U.S. ——, ——,

15

135 S.Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938) (emphasis deleted). And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." Ibid.; see, e.g., Perales, 402 U.S. at 401, 91 S.Ct. 1420 (internal quotation marks omitted). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison, 305 U.S. at 229, 59 S.Ct. 206. See Dickinson v. Zurko, 527 U.S. 150, 153, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

Biestek, 139 S. Ct. at 1154.

The question before this Court, therefore, is not whether the claimant is disabled, but rather whether the Commissioner's finding that she is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law. See Arnold v. Colvin, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence") (alterations omitted); Burton v. Schweiker, 512 F. Supp. 913, 914 (W.D. Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts."); see also Wright v. Sullivan, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal

16

matters is plenary); Ficca, 901 F. Supp.2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

Several fundamental legal propositions which flow from this deferential standard of review. First, when conducting this review "we are mindful that we must not substitute our own judgment for that of the fact finder." Zirnsak v. Colvin, 777 F.3d 607, 611 (3d Cir. 2014) (citing Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir. 2005)). Thus, we are enjoined to refrain from trying to re-weigh the evidence. Rather our task is to simply determine whether substantial evidence supported the ALJ's findings. However, we must also ascertain whether the ALJ's decision meets the burden of articulation demanded by the courts to enable informed judicial review. Simply put, "this Court requires the ALJ to set forth the reasons for his decision." Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 119 (3d Cir. 2000). As the Court of Appeals has noted on this score:

> In Burnett, we held that an ALJ must clearly set forth the reasons for his decision. 220 F.3d at 119. Conclusory statements . . . are insufficient. The ALJ must provide a "discussion of the evidence" and an "explanation of reasoning" for his conclusion sufficient to enable meaningful judicial review. Id. at 120; see Jones v. Barnhart, 364 F.3d 501, 505 & n. 3 (3d Cir.2004). The ALJ, of course, need not employ particular "magic" words: "Burnett does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis." Jones, 364 F.3d at 505.

Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 504 (3d Cir. 2009).

17

Thus, in practice ours is a twofold task. We must evaluate the substance of the ALJ's decision under a deferential standard of review, but we must also give that decision careful scrutiny to ensure that the rationale for the ALJ's actions is sufficiently articulated to permit meaningful judicial review.

This principle applies with particular force to legal challenges, like the claim made here, based upon alleged inadequacies in the articulation of a claimant's mental RFC. In Hess v. Comm'r Soc. Sec., 931 F.3d 198, 212 (3d Cir. 2019), the United States Court of Appeals recently addressed the standards of articulation that apply in this setting. In Hess the court of appeals considered the question of whether an RFC which limited a claimant to simple tasks adequately addressed moderate limitations on concentration, persistence, and pace. In addressing the plaintiff's argument that the language used by the ALJ to describe the claimant's mental limitations was legally insufficient, the court of appeals rejected a *per se* rule which would require the ALJ to adhere to a particular format in conducting this analysis. Instead, framing this issue as a question of adequate articulation of the ALJ's rationale, the court held that: "as long as the ALJ offers a 'valid explanation,' a 'simple tasks' limitation is permitted after a finding that a claimant has 'moderate' difficulties in 'concentration, persistence, or pace.' " Hess v. Comm'r Soc. Sec., 931

18

F.3d 198, 211 (3d Cir. 2019). On this score, the appellate court indicated that an ALJ offers a valid explanation a mental RFC when the ALJ highlights factors such as "mental status examinations and reports that revealed that [the claimant] could function effectively; opinion evidence showing that [the claimant] could do simple work; and [the claimant]'s activities of daily living, . . . . " Hess v. Comm'r Soc. Sec., 931 F.3d 198, 214 (3d Cir. 2019).

In our view, the teachings of the Hess decision are straightforward. In formulating a mental RFC the ALJ does not need to rely upon any particular form of words. Further, the adequacy of the mental RFC is not gauged in the abstract. Instead, the evaluation of a claimant's ability to undertake the mental demands of the workplace will be viewed in the factual context of the case, and a mental RFC is sufficient if it is supported by a valid explanation grounded in the evidence.

### B. Initial Burdens of Proof, Persuasion, and Articulation for the ALJ

To receive benefits under the Social Security Act by reason of disability, a claimant must demonstrate an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A); see also 20 C.F.R. §404.1505(a).  To satisfy this requirement, a claimant must have a severe

19

physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful activity that exists in the national economy. 42 U.S.C. §423(d)(2)(A); 20 C.F.R. §404.1505(a). To receive benefits under Title II of the Social Security Act, a claimant must show that he or she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he or she was last insured. 42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process. 20 C.F.R. §404.1520(a). Under this process, the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC").  20 C.F.R. §404.1520(a)(4).

Between Steps 3 and 4, the ALJ must also assess a claimant's residual functional capacity (RFC).  RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000) (citations omitted); see also 20 C.F.R. §§404.1520(e), 404.1545(a)(1).  In making this assessment, the ALJ considers all of

20

the claimant's medically determinable impairments, including any non-severe impairments identified by the ALJ at step two of his or her analysis.   20 C.F.R. §404.1545(a)(2).

There is an undeniable medical aspect to an RFC determination, since that determination entails an assessment of what work the claimant can do given the physical limitations that the claimant experiences. Yet, when considering the role and necessity of medical opinion evidence in making this determination, courts have followed several different paths. Some courts emphasize the importance of medical opinion support for an RFC determination and have suggested that "[r]arely can a decision be made regarding a claimant's residual functional capacity without an assessment from a physician regarding the functional abilities of the claimant." Biller v. Acting Comm'r of Soc. Sec., 962 F. Supp. 2d 761, 778–79 (W.D. Pa. 2013) (quoting Gormont v. Astrue, Civ. No. 11–2145, 2013 WL 791455 at *7 (M.D. Pa. Mar. 4, 2013)). In other instances, it has been held that: "There is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC." Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006). Further, courts have held in cases where there is no evidence of any credible medical opinion supporting a claimant's allegations of disability that "the proposition that an ALJ must always base his RFC on a medical opinion from a

21

physician is misguided." Cummings v. Colvin, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015).

These seemingly discordant legal propositions can be reconciled by evaluation of the factual context of these decisions. Those cases which emphasize the importance of medical opinion support for an RFC assessment typically arise in the factual setting where a well-supported medical source has identified limitations that would support a disability claim, but an ALJ has rejected the medical opinion which supported a disability determination based upon a lay assessment of other evidence. Biller, 962 F.Supp.2d at 778–79. In this setting, these cases simply restate the commonplace idea that medical opinions are entitled to careful consideration when making a disability determination, particularly when those opinions support a finding of disability. In contrast, when an ALJ is relying upon other evidence, such as contrasting clinical or opinion evidence or testimony regarding the claimant's activities of daily living, to fashion an RFC courts have adopted a more pragmatic view and have sustained the ALJ's exercise of independent judgment based upon all of the facts and evidence. See Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006); Cummings v. Colvin, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015). In either event, once the ALJ has made this determination, our review of the ALJ's assessment of the plaintiff's RFC is deferential, and that RFC assessment will not be set aside if

22

it is supported by substantial evidence. <u>Burns v. Barnhart</u>, 312 F.3d 113, 129 (3d Cir. 2002); <u>see also Metzger v. Berryhill</u>, No. 3:16-CV-1929, 2017 WL 1483328, at *5 (M.D. Pa. Mar. 29, 2017), <u>report and recommendation adopted sub nom. Metzgar v. Colvin</u>, No. 3:16-CV-1929, 2017 WL 1479426 (M.D. Pa. Apr. 21, 2017); <u>Rathbun v. Berryhill</u>, No. 3:17-CV-00301, 2018 WL 1514383, at *6 (M.D. Pa. Mar. 12, 2018), <u>report and recommendation adopted</u>, No. 3:17-CV-301, 2018 WL 1479366 (M.D. Pa. Mar. 27, 2018).

At Steps 1 through 4, the claimant bears the initial burden of demonstrating the existence of a medically determinable impairment that prevents him or her in engaging in any of his or her past relevant work. <u>Mason</u>, 994 F.2d at 1064. Once this burden has been met by the claimant, it shifts to the Commissioner at Step 5 to show that jobs exist in significant number in the national economy that the claimant could perform that are consistent with the claimant's age, education, work experience and RFC. 20 C.F.R. §404.1512(f); <u>Mason</u>, 994 F.2d at 1064.

The ALJ's disability determination must also meet certain basic substantive requisites. Most significant among these legal benchmarks is a requirement that the ALJ adequately explain the legal and factual basis for this disability determination. Thus, in order to facilitate review of the decision under the substantial evidence standard, the ALJ's decision must be accompanied by "a clear and satisfactory

23

explication of the basis on which it rests." Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981). Conflicts in the evidence must be resolved and the ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Id. at 706-07. In addition, "[t]he ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." Schaudeck v. Comm'r of Soc. Sec., 181 F.3d 429, 433 (3d Cir. 1999).

## C. **Legal Benchmarks for the ALJ's Assessment of Medical Opinions**

The plaintiff filed this disability application following a paradigm shift in the manner in which medical opinions were evaluated when assessing Social Security claims. Prior to March 2017, ALJs were required to follow regulations which defined medical opinions narrowly and created a hierarchy of medical source opinions with treating sources at the apex of this hierarchy. However, in March of 2017, the Commissioner's regulations governing medical opinions changed in a number of fundamental ways. The range of opinions that ALJs were enjoined to consider were broadened substantially, and the approach to evaluating opinions was changed from a hierarchical form of review to a more holistic analysis. As one court as aptly observed:

> The regulations regarding the evaluation of medical evidence have been amended for claims filed after March 27, 2017, and several of the prior Social Security Rulings, including SSR 96-2p, have been rescinded.

24

According to the new regulations, the Commissioner "will no longer give any specific evidentiary weight to medical opinions; this includes giving controlling weight to any medical opinion." Revisions to Rules Regarding the Evaluation of Medical Evidence ("Revisions to Rules"), 2017 WL 168819, 82 Fed. Reg. 5844, at 5867–68 (Jan. 18, 2017), see 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Instead, the Commissioner must consider all medical opinions and "evaluate their persuasiveness" based on the following five factors: supportability; consistency; relationship with the claimant; specialization; and "other factors." 20 C.F.R. §§ 404.1520c(a)-(c), 416.920c(a)-(c).

Although the new regulations eliminate the perceived hierarchy of medical sources, deference to specific medical opinions, and assigning "weight" to a medical opinion, the ALJ must still "articulate how [he or she] considered the medical opinions" and "how persuasive [he or she] find[s] all of the medical opinions." Id. at §§ 404.1520c(a) and (b)(1), 416.920c(a) and (b)(1). The two "most important factors for determining the persuasiveness of medical opinions are consistency and supportability," which are the "same factors" that formed the foundation of the treating source rule. Revisions to Rules, 82 Fed. Reg. 5844-01 at 5853.

An ALJ is specifically required to "explain how [he or she] considered the supportability and consistency factors" for a medical opinion. 20 C.F.R. §§ 404.1520c (b)(2), 416.920c(b)(2). With respect to "supportability," the new regulations provide that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." Id. at §§ 404.1520c(c)(1), 416.920c(c)(1). The regulations provide that with respect to "consistency," "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." Id. at §§ 404.1520c(c)(2), 416.920c(c)(2).

> Under the new regulations an ALJ must consider, but need not explicitly discuss, the three remaining factors in determining the persuasiveness of a medical source's opinion. Id. at §§ 404.1520c(b)(2), 416.920c(b)(2). However, where the ALJ has found two or more medical opinions to be equally well supported and consistent with the record, but not exactly the same, the ALJ must articulate how he or she considered those factors contained in paragraphs (c)(3) through (c)(5). Id. at §§ 404.1520c(b)(3), 416.920c(b)(3).

Andrew G. v. Comm'r of Soc. Sec., No. 3:19-CV-0942 (ML), 2020 WL 5848776, at *5 (N.D.N.Y. Oct. 1, 2020).

Oftentimes, as in this case, an ALJ must evaluate various medical opinions. When presented with a disputed factual record, it is well-established that "[t]he ALJ – not treating or examining physicians or State agency consultants – must make the ultimate disability and RFC determinations." Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 361 (3d Cir. 2011). However, the ALJ must still fully articulate the basis of this medical opinion evaluation. Thus, when evaluating medical opinions "the ALJ may choose whom to credit but 'cannot reject evidence for no reason or for the wrong reason.'" Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000) (quoting Mason, 994 F.2d at 1066). It also follows that "when a medical opinion is found persuasive and contains a limitation to one- and two-step tasks, the ALJ is obligated to either: (1) include the limitation in the RFC and limit the claimant to reasoning level one

26

occupations, or, (2) identify the substantial evidence that the ALJ is relying on in rejecting the limitation." Cruz, 2025 WL 2813882, at *8.

These legal benchmarks guide us in the instant case.

### D. **This Case Should Be Remanded.**

After a review of the record, we conclude that the ALJ's failure to more thoroughly address or incorporate the state agency consultant's opinion which the ALJ deemed persuasive that limited Lombardo to one- and two-step tasks was error. At the outset, in reviewing this ALJ's decision we find ourselves at the intersection between two well-settled paradigms in the Social Security field. First, our highly deferential standard of review empowers "[t]he ALJ – not treating or examining physicians or State agency consultants – [to] make the ultimate disability and RFC determinations." Chandler, 667 F.3d at 361. Thus, our decision in this case in no way undercuts the legal tenet that an ALJ is not required to adopt every limitation opined by the experts but "can formulate an RFC based on different parts from the different medical opinions." Durden, 191 F.Supp.3d at 455. However, at base, an ALJ must draft a reviewable opinion that is grounded in the evidence and provides the court with an adequately articulated rationale for the limitations adopted. Here, without the benefit of an explanation by the ALJ, we are unable to determine whether the ALJ's failure to address the limitation to one- and two-step tasks in the sole

27

medical opinion the ALJ found persuasive was inadvertent or based upon the substantial evidence of record.

This assessment by the ALJ runs afoul of several well-settled legal tenets. First, as enumerated above, an ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." Cotter, 642 F.2d at 704. Furthermore, the ALJ must also "indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." Schaudeck, 181 F.3d at 433. Moreover, it is well-settled that an ALJ should refrain from substituting his own lay opinion in place of a medical opinion. Morales 225 F.3d at 319. These mandates apply here in the context of the ALJ's assessment of medical opinion evidence limiting a claimant to one-to-two-step tasks. Indeed, this Court, and others, have applied these paradigms in specifically concluding that "when a medical opinion is found persuasive and contains a limitation to one- and two-step tasks, the ALJ is obligated to either: (1) include the limitation in the RFC and limit the claimant to reasoning level one occupations, or, (2) identify the substantial evidence that the ALJ is relying on in rejecting the limitation." Cruz, 2025 WL 2813882, at *8. See also Rita R. v. Kijakazi, No. 21 C 5631, 2023 WL 2403139, at *3–4 (N.D. Ill. Mar. 8, 2023) ("Indeed, an ALJ is required to provide a thorough and appropriate explanation for rejecting a state agency psychologist's opinion that a claimant is

28

limited to one-to-two step tasks"). The ALJ's decision in this case neither included the one-to-two-step limitation, nor explained why it was not incorporated into the RFC. This was error.

This error is not harmless here since the ALJ's conclusion that Lombardo was not disabled is based upon her ability to perform work in occupations requiring a reasoning levels of 2 or 3, reasoning levels that were inconsistent with a limitation to one- to two-step tasks. As this court explained:

> The DOT defines occupations by reasoning level and defines "reasoning level one" as the ability to "apply commonsense understanding to carry out *simple one-or two-step instructions.*" The similarity of that language to "one- and two-step tasks," leads us to conclude that an individual limited to "one-and two-step tasks" is likewise limited to "reasoning level one" occupations. Importantly, this limitation *is* dischargeable: an ALJ may find otherwise, so long as they rely on and cite to substantial evidence that adequately explains why they are omitting the limitation in the claimant's RFC despite having found the relevant medical opinion to be persuasive.

> Additionally, courts in eight of the eleven circuits where a District court has considered this issue have held that "simple repetitive tasks" and "one- and two-step tasks" are legally distinct limitations. And all but one of these cases also found that a limitation to "one- and two-step tasks" necessarily limits the claimant to reasoning level one occupations.

Cruz, 2025 WL 2813882, at *7. See also Id. at *3–4 (N.D. Ill. Mar. 8, 2023). See also Rita R., 2023 WL 2403139, at *3–4 ("The ALJ's error is of crucial importance

29

because a limitation to 'simple tasks' (the RFC limitation the ALJ found here) encompasses jobs that may involve complexity beyond one-to-two step tasks"); Daniel M. v. Kijakazi, No. 2:21-CV-243, 2023 WL 154909, at *3 (D. Vt. Jan. 11, 2023) (collecting cases) (concluding reasoning Levels 2 and 3 are not consistent with "simple, one-to-two step tasks").

The Commissioner suggests that this error was harmless and invites us to affirm this decision even though the decision ignores a limitation to one-to-two-step tasks which the ALJ found persuasive. While we agree that in certain circumstances this error may be harmless, we must decline this invitation on the facts of the instant case for at least two reasons. First, at bottom, this argument, which calls upon us to discount the ALJ's statement that Dr. Gavazzi's opinion stating that Lombardo can perform one- and two-step tasks, essentially urges us to reweigh the evidence. This we may not do. See Chandler, 667 F.3d at 359 (citing Richardson v. Perales, 402 U.S. 389, 401 (1971) ("Courts are not permitted to re-weigh the evidence or impose their own factual determinations"); see also Gonzalez v. Astrue, 537 F.Supp.2d 644, 657 (D. Del. 2008) ("In determining whether substantial evidence supports the Commissioner's findings, the Court may not undertake a *de novo* review of the Commissioner's decision and may not re-weigh the evidence of the record") (internal citations omitted)). In addition, the Commissioner would have us substitute

30

a different rationale for this decision, one which discounted a material aspect of Dr. Gavazzi's opinion which the ALJ declared persuasive.  We cannot follow this course since it is well-settled that "[t]he ALJ's decision must stand or fall with the reasons set forth in the ALJ's decision; the Commissioner may not offer a post-hoc rationalization." Schuster v. Astrue, 879 F. Supp. 2d 461, 466 (E.D. Pa. 2012) (citations omitted).

Simply put, more was needed here by way of explanation on the ALJ's part. Indeed, a rising tide of caselaw supports the view that the ALJ erred in failing to address the one- and two-step task limitation opined by the expert whose opinion he found persuasive.[3] Since the ALJ's burden of articulation is not met in the instant case, this matter will be remanded for further consideration by the Commissioner.

Yet, while we find that these errors compel a remand in this case, nothing in this Memorandum Opinion should be deemed as expressing a judgment on what the ultimate outcome of any reassessment of this evidence should be. Instead, that

---

[3] See e.g., Whitney v. Bisignano, No. 4:24-CV-1950, 2026 WL 522922, at *10 (M.D. Pa. Feb. 25, 2026);  Cruz v. Bisignano, No. 1:24-CV-1966, 2025 WL 2813882, at *7 (M.D. Pa. Sept. 30, 2025); Michelle M. v. Bisignano, No. 3:23-CV-02163, 2025 WL 2713737, at *7 (M.D. Pa. Sept. 23, 2025); Warren v. Dudek, No. 1:24-CV-635, 2025 WL 1168276, at *6 (M.D. Pa. Apr. 22, 2025);  Shipman v. Kizakazi, No. 3:22-CV-00636, 2023 WL 5599607, at *10 (M.D. Pa. Aug. 29, 2023).

31

judgment should remain to province of the ALJ. Finally, because we have vacated and remanded the decision of the Commissioner on these grounds, we decline to address any other issues since "[a] remand may produce different results on these claims, making discussion of them moot." Burns v. Colvin, 156 F.Supp.3d 579, 598 (M.D. Pa. Jan. 13, 2016).

We close as we began, by observing that one root cause of this remand is an issue which courts have repeatedly observed, the apparent failure of legal and medical professionals to attach a common meaning to the words they use. Thus, we note for the Commissioner that the casual conflation of one-to-two-step RFCs in medical opinions with widely varying opinions regarding the claimant's degree of impairment, if unaddressed, will continue to compel remands in the future.

## IV.    Conclusion

For the foregoing reasons the plaintiff's request for a new administrative hearing will be GRANTED, the final decision of the Commissioner denying these claims will be vacated, and this case will be remanded to the Commissioner to conduct a new administrative hearing.

An appropriate order follows.

*S/ Martin C. Carlson*
Martin C. Carlson
United States Magistrate Judge

DATED: March 10, 2026